**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUSTIN FULCHER, | Case No.:  26-cv-02026 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GUARDIAN NEWS & MEDIA LLC; and DOES 1-10, inclusive, | |
| Defendants. | |

**PARTIES**

1.    Plaintiff Justin Fulcher ("Plaintiff" or "Mr. Fulcher") is an individual who, at all relevant times, was and is domiciled in Charleston County, South Carolina.

2.    On information and belief, Defendant Guardian News & Media LLC ("The Guardian" or "Defendant") is a corporation incorporated under the laws of Delaware and with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

3.    This court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000.

4.    Pursuant to 28 U.S.C. § 1391 venue in this judicial district is proper because, among other things, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, including because the article at issue in this action, which was published by The Guardian, was written in the District of Columbia.

1

## **FACTUAL ALLEGATIONS**

5.   On June 9, 2025, The Guardian published an Article on its website at https://www.theguardian.com/us-news/2025/jun/09/hegseth-wiretap-inquiry-justin-fulcher   (the "Article").

6.   The Article contains numerous false and defamatory statements of and concerning Mr. Fulcher that are attributed to four unnamed sources.  These statements include:

a.   "Hegseth aide upended Pentagon leak inquiry with false wiretap claims".

b.   "ex-Doge staffer Justin Fulcher suggested he had evidence of wiretap that would help investigation".

c.   "Days before Pete Hegseth fired three top aides last month over a Pentagon leak investigation into the disclosure of classified materials, according to four people familiar with the episode, a recently hired senior advisor said he could help with the inquiry."

d.   "The advisor, Justin Fulcher, suggested to Hegseth's then chief of staff, Joe Kasper, and Hegseth's personal lawyer, Tim Parlatore, that he knew of warrantless surveillance conducted by the National Security Agency (NSA) that had identified the leakers."

e.   "Fulcher offered to share the supposed evidence as long as he could help run the investigation, three of the people said.  But when he eventually sat down with officials, it became clear he had no evidence of a wiretap, and the Pentagon had been duped."

f.      "The problem was that development was not communicated to the White House – so several Trump advisors who were told of the NSA wiretap claim believed that was part of the 'smoking gun' evidence against the three aides fired by Hegseth, until they developed their own doubts."

g.      "The Guardian revealed last month that there were unsubstantiated NSA warrantless wiretap claims underpinning the leak investigation, but its origin story and the involvement of Fulcher in the controversy has not been previously reported."

h.      "It was not immediately clear why Fulcher chose to become involved in the investigation, but several days after he was replaced as a Doge lead, he went to Kasper and expressed a willingness to help with the investigation, which Kasper attributed to him wanting to prove his worth, two of the people said."

i.      "Kasper told Fulcher to go to Parlatore, who had been tasked with supervising and managing the investigation. When Fulcher approached Parlatore, he suggested that he knew of NSA intercepts supposedly showing that Caldwell had leaked using his personal phone, the two people said."

j.      "Looking back on the chain of events, three people familiar with the conversations described Fulcher's claims as conveniently dovetailing with prevailing suspicions at the time about Caldwell printing lots of documents and his efforts to have the leak investigation shut down."

k.      "Still, a cursory check at that stage into the NSA claims [by Mr. Fulcher] would have shown them to be false."

3

l.        "The claims [by Mr. Fulcher] were relayed to Hegseth and the White House as being accurate."

7.        These statements are false and defamatory.

8.        In truth, Mr. Fulcher never suggested, stated or otherwise communicated to Joe Kasper, Tim Parlatore, or anyone else that the NSA had conducted warrantless surveillance that identified the source(s) of the leak alleged in the Article, or that Mr. Fulcher had access to such surveillance. Further, Mr. Fulcher never asked Joe Kasper, Tim Parlatore, or anyone else if he could join or assist with an investigation into the leak alleged by the Article, nor did he tell anyone that he could "help run" it.

### FOR A FIRST CAUSE OF ACTION
#### (Defamation)

9.        Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 8 as though fully set forth herein.

10.        The Article contained false statements which had the tendency to, and caused damage to Plaintiff.

11.        The false statements were of and concerning Plaintiff.

12.        The false statements were defamatory *per se* because they constitute libel and tend to damage Plaintiff in his trade and profession, and accuse Plaintiff of criminal conduct, including that Plaintiff made false statements to government officials and had access to illegal warrantless wiretaps.

13.        The Guardian acted with at least reckless disregard for the truth, by consciously disregarding readily available information that showed that the false statements were at least highly likely to be false. Among other things, the NSA is prohibited by law from intentionally targeting United States citizens, persons known to be located within the United States and communications

in which the sender and recipients are known to be located within the United States. *See* 50 U.S.C. § 1881a. Further, the NSA is only authorized to conduct electronic surveillance without a court order for the purpose of acquiring "foreign intelligence" that consists of communications exclusively between foreign powers. *See* 50 U.S.C. § 1802; *see also United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297 (1972) (compliance with Fourth Amendment required for domestic national security matters). The subjects of the purported warrantless wiretaps alleged by the Article, were, at all relevant times, United States citizens and the leak alleged in the Article was to one or more media outlets located within the United States. As such, the NSA could not have conducted the warrantless searches described in the Article. Moreover, Joe Kasper and Tim Parlatore, as senior officials of the Department of War, and the referenced advisors for President Trump, at all relevant times, had full knowledge of the prohibition on targeting United States citizens and those located within the country, and thus the Article's allegations that Mr. Fulcher had informed Kasper (who was terminated from his position with the Department of War before Mr. Fulcher even began working there) and Parlatore of the existence of purported warrantless wiretaps of United States citizens, and that Kasper, Parlatore and advisors for President Trump believed Mr. Fulcher's alleged statements or had been "duped", are implausible. Further, had the false statements of and concerning Mr. Fulcher been true (which they are not), it is reasonably expected that Mr. Fulcher would have been disqualified from a position with the government, instead of being brought on as senior advisor for the Secretary of War, Pete Hegseth, as acknowledged in the Article. In addition, in relying on the four unidentified sources for the false statements, The Guardian knew, or should have known, that these sources had an obvious bias against Mr. Fulcher because, among other things, and on information and belief, Mr. Fulcher replaced, at least in part, the role(s) occupied by one or more of the sources, rendering

5

these sources and their statements inherently unreliable.  The Guardian, in making the false statements, also unreasonably believed the accounts provided by the four unnamed sources, who, on information and belief, had been terminated from their government positions, over the express denials of Mr. Fulcher, who at all relevant times, remained in good standing with the United States Government, and who spoke to Hugo Lowell, the author of the Article who resides in Washington, D.C., over the telephone prior to publication and provided a detailed explanation (in addition to the statement published in the Article) as to why the statements at issue were false.

14.    As a direct and proximate cause of the false and libelous publications by The Guardian, Plaintiff's damages include, but are not limited to, presumed general damages and damages to reputation and character.  For instance, Mr. Fulcher was in the latter stages of negotiating an advisory/consulting agreement with a venture capital-backed firm, which could have yielded Mr. Fulcher up to $12 million in total cash and equity compensation. These negotiations were terminated once Mr. Fulcher's counter-parties learned of the Article.  Mr. Fulcher also negotiated an advisory/consulting agreement with an AI company, which could have yielded Mr. Fulcher up to $1.6 million in total equity compensation.  These negotiations were terminated once the AI company learned of the Article and questioned Mr. Fulcher about the false claims therein.  Mr. Fulcher was also negotiating a potential agreement with a technology venture which could have yielded Mr. Fulcher more than $6 million in equity compensation.  These negotiations were terminated once the counter-parties learned of the Article.

15.    The Guardian's conduct was willful, wanton, and/or reckless, entitling Plaintiff to an award of punitive damages.

**FOR A SECOND CAUSE OF ACTION**
**(Injunctive Relief)**

16.     Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 15 as though fully set forth herein.

17.     Plaintiff requests a permanent injunction against The Guardian from publishing further false and defamatory statements about Plaintiff, regarding the same or substantially similar prior publications referenced above in order to prevent further damage and harm to Plaintiff's reputation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a.  For presumed general, actual and compensatory damages according to proof;

b.  For punitive damages;

c.  For a permanent injunction against publication of the defamatory statements in the Article;

d.  For costs of suit; and

e.  For such other and further relief as the Court deems appropriate.

Dated: June 8, 2026                         Respectfully submitted,

Ryan J. Stonerock, Esq. (D.C. Bar No. 1632636)
Dilan A. Esper, Esq. (*pro hac vice* to be filed)
Steven H. Frackman, Esq. (*pro hac vice* to be filed)
HARDER STONEROCK LLP
6300 Wilshire Boulevard, Suite 640
Los Angeles, California 90048
Tel:  (424) 203-1600
rstonerock@harderstonerock.com
desper@harderstonerock.com
sfrackman@harderstonerock.com

Counsel for Plaintiff Justin Fulcher

7