UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUSTIN FULCHER,

Plaintiff,

v.

GUARDIAN NEWS & MEDIA LLC; and DOES 1-10, inclusive,

Defendants.

Case No. 26-cv-02026-RDM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GUARDIAN NEWS & MEDIA LLC'S MOTION TO DISMISS**

BALLARD SPAHR LLP

Seth D. Berlin (Bar No. 433611)
Lauren P. Russell (Bar No. 7567949)
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Tel: (202) 661-2200
Fax: (202) 661-2299
berlins@ballardspahr.com
russelll@ballardspahr.com

*Counsel for Defendant Guardian News & Media LLC*

Date: August 17, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

FACTUAL BACKGROUND ..... 3

A. The Article's Backdrop: An Ongoing Focus on Pentagon Leaks ..... 3

B. The Challenged Article ..... 7

C. This Lawsuit ..... 10

STANDARD OF REVIEW ..... 13

ARGUMENT ..... 13

I. FULCHER WAS A PUBLIC OFFICIAL AT THE TIME OF PUBLICATION ..... 15

II. FULCHER DOES NOT PLEAD FACTS THAT, IF PROVEN, WOULD ESTABLISH ACTUAL MALICE ..... 17

A. Relying on Multiple Sources, While Failing to Credit Plaintiff's Denials, Does Not Constitute Actual Malice ..... 17

B. The Supposed "Inherent Implausibility" of Unauthorized Domestic NSA Wiretapping Allegations Are Insufficient to Plead Actual Malice ..... 21

III. FULCHER'S LAWSUIT SHOULD BE DISMISSED WITH PREJUDICE ..... 26

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*,
783 F.3d 1328 (D.C. Cir. 2015) ....................26

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013)....................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................17

*Arpaio v. Cottle*,
2019 WL 11322515 (D.D.C. Dec. 3, 2019)....................20

*Arpaio v. Cottle*,
404 F. Supp. 3d 80 (D.D.C. 2019) ....................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................13, 17

*Berisha v. Lawson*,
973 F.3d 1304 (11th Cir. 2020) ....................19

*Biro v. Condé Nast*,
807 F.3d 541 (2d Cir. 2015)....................14

*Boley v. Atlantic Monthly Grp.*,
950 F. Supp. 2d 249 (D.D.C. 2013) ....................14

*Camp v. Professional Employee Services*,
2025 WL 2694832 (D.D.C. Sept. 22, 2025) ....................7

* *Couch v. Verizon Communications Inc.*,
105 F.4th 425 (D.C. Cir. 2024).................... *passim*

*Deripaska v. Associated Press*,
282 F. Supp. 3d 133 (D.D.C. 2017) ....................14

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) ....................19

*United States ex rel. Gardner v. Vanda Pharmaceuticals, Inc.*,
2020 WL 2542121 (D.D.C. May 19, 2020)....................3

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)....15

*Gray v. St. Martin's Press*,
221 F.3d 243 (1st Cir. 2000)....19

*Gray v. Udevitz*,
656 F.2d 588 (10th Cir. 1981)....16

*Harvey v. CNN, Inc.*,
48 F.4th 257 (4th Cir. 2022)....16, 18

*Hourani v. PsyberSolutions LLC*,
164 F. Supp. 3d 128 (D.D.C. 2016)....14

[*]*Jankovic v. International Crisis Group*,
822 F.3d 576 (D.C. Cir. 2016)....15, 22

[*]*Kahl v. Bureau of National Affairs, Inc.*,
856 F.3d 106 (D.C. Cir. 2017)....15

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988)....21

[*]*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003)....15, 20

*Luhn v. Scott*,
2019 WL 5810309 (D.D.C. Nov. 7, 2019)....23

*Mar-Jac Poultry, Inc. v. Katz*,
773 F. Supp. 2d 103 (D.D.C. 2011)....15

*Mayfield v. National Association for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012)....14

*McCafferty v. Newsweek Media Group, Ltd.*,
955 F.3d 352 (3d Cir. 2020)....14

*McDonald v. Wise*,
769 F.3d 1202 (10th Cir. 2014)....14

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016)....14, 20

*Montgomery v. Risen*,
197 F. Supp. 3d 219 (D.D.C. 2016)....18

*Murray v. Shaw*,
2025 WL 915752 (D.D.C. Mar. 26, 2025)....................16

*Nelson Auto Center v. Multimedia Holdings Corp.*,
951 F.3d 952 (8th Cir. 2020)....................14

[*]*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................13, 14, 23

*Newton v. NBC, Inc.*,
930 F.2d 662 (9th Cir. 1990)....................20

*Nunes v. NBCUniversal Media, LLC*,
2025 WL 2199115 (S.D.N.Y. Aug. 1, 2025)....................22

*Nurriddin v. Bolden*,
818 F.3d 751 (D.C. Cir. 2016)....................13

*Parisi v. Sinclair*,
845 F. Supp. 2d 215 (D.D.C. 2012)....................14

*Pierce v. Capital Cities Communications, Inc.*,
576 F.2d 495 (3d Cir. 1978)....................16

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013)....................14

*Prince v. Intercept*,
2023 WL 4492413 (S.D.N.Y. Jul. 12, 2023)....................22

*Rosenblatt v. Baer*,
383 U.S. 75 (1966)....................15, 16

*Ryniewicz v. Clarivate Analytics*,
803 F. App'x 858 (6th Cir. 2020)....................14

*Sandza v. Barclays Bank PLC*,
151 F. Supp. 3d 94 (D.D.C. 2015)....................3

*Satanic Temple, Inc. v. Newsweek Digital LLC*,
177 F.4th 202 (2d Cir. 2026)....................19

*Schatz v. Republican State Leadership Committee*,
669 F.3d 50 (1st Cir. 2012)....................14

*St. Amant v. Thompson*,
390 U.S. 727 (1968)....................17

*Tah v. Global Witness Publishing, Inc.*,
413 F. Supp. 3d 1 (D.D.C. 2019) ....................20

*Tah v. Global Witness Publishing, Inc.*,
991 F.3d 231 (D.C. Cir. 2021) ....................14

*Talley v. Time, Inc.*,
923 F.3d 878 (4th Cir. 2019) ....................19

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987) ....................19

*Thompson v. Armstrong*,
134 A.3d 305 (D.C. 2016) ....................13

*Trump v. CNN, Inc.*,
684 F. Supp. 3d 1269 (S.D. Fla. 2023) ....................23

*Trump v. Dow Jones & Co., Inc.*,
--- F. Supp. 3d ----, 2026 WL 1453673 (S.D. Fla. May 22, 2026) ....................21

*Turner v. Wells*,
879 F.3d 1254 (11th Cir. 2018) ....................14

*United States v. Hasbajrami*,
2025 WL 447498 (E.D.N.Y. Feb. 10, 2025)....................25

*Walker v. Beaumont Independent School District*,
938 F.3d 724 (5th Cir. 2019) ....................14

*Washington Post v. Robinson*,
935 F.2d 282 (D.C. Cir. 1991) ....................3

*White v. Fraternal Order of Police*,
909 F.2d 512 (D.C. Cir. 1990) ....................15

**Statutes**

18 U.S.C. § 2712....................24

50 U.S.C. § 1801....................24

50 U.S.C. § 1810....................24

**Other Authorities**

*U.S. Const., Amend. I.................... *passim*

Fed. R. Evid. 201(c) ....................3

## PRELIMINARY STATEMENT

This defamation lawsuit targets a June 2025 article (the "Article") published by defendant Guardian News & Media LLC ("*The Guardian*"). The Article addressed questions about the Pentagon's investigation into leaks of sensitive information and the firing of three advisors thought to be responsible. Specifically, in the Article, *The Guardian* reported that Plaintiff Justin Fulcher ("Fulcher")—who began as a Department of Government Efficiency ("DOGE") employee embedded at the Pentagon and was later hired as a senior advisor to the Secretary of Defense—offered to help lead the leak investigation and said he was aware of National Security Agency ("NSA") intercepts supposedly identifying the leakers. The Article further reported that Pentagon leadership initially believed his claims, leading to the firing of the three advisors, only to later conclude there were no such wiretaps. *The Guardian*'s reporting thus raised important questions about both Fulcher's fitness to serve as a senior advisor to the Secretary of Defense as well as the competency of Pentagon leadership more broadly, including in its initial reliance on Fulcher's claims of warrantless NSA intercepts and its later reversal.

As reflected in the Article and in Fulcher's Complaint, *The Guardian* based its reporting on multiple sources who were familiar with these events, but who understandably did not want to be identified while confirming details of an internal probe that itself was investigating leaks. For his part, Fulcher alleges that he never claimed to have knowledge of NSA intercepts or asked to participate in the investigation. *The Guardian* reported his denials. It also contacted the White House and the Department of Defense for comment, but they did not deny the allegations or provide any official statement.

A year after the Article was published and without seeking a correction, Fulcher brought this lawsuit claiming that *The Guardian*'s reporting is actionably false and defamatory. But to prevail on a defamation claim, Fulcher—indisputably a public official at the time of

publication—must also plead and prove, by clear and convincing evidence, that *The Guardian* published the challenged statements with actual malice, *i.e.*, that it either *knew* the challenged statements were false or *in fact* entertained serious doubts as to their truth, yet published them anyway. Here, Fulcher claims that *The Guardian* published the Article with actual malice because it was supposedly required to disbelieve four sources who corroborated one another and should have instead credited his denials. But the law imposes no such requirement; indeed, were it otherwise, public officials like Fulcher would, simply by issuing a denial, effectively have veto power over reporting about the performance of their official duties.

Fulcher also attempts to manufacture an allegation of actual malice by asserting that (a) domestic NSA wiretaps are unlawful, and (b) *The Guardian* should therefore have disbelieved as "inherently implausible" statements by its multiple sources that Fulcher claimed there were NSA intercepts and that the Pentagon brass initially believed him. But actual malice focuses on a defendant's subjective belief as to the truth—not what the plaintiff claims the defendant objectively "should have" believed. In any event, the NSA has a well-documented history of engaging in unlawful surveillance. Particularly when taken together with various then-recent Pentagon security failures, including discussing ongoing military strikes on a Signal thread that included the editor of *The Atlantic*, there was nothing about *The Guardian*'s coverage that was so "inherently implausible" that the publisher could not possibly have believed it. That is all the more so where *The Guardian*'s reporting *expressly acknowledged* that the NSA engages in both "authorized and unauthorized" surveillance, that domestic NSA intercepts are generally unlawful, and that their illegality should have led Pentagon officials to question the assertions attributed to Fulcher. Under governing law, reporting what multiple sources said about Fulcher's

conduct, while also reporting facts that arguably call into question those assertions, including Fulcher's denials, negates a finding of actual malice.

Because Fulcher's allegations, even if proven, could not establish actual malice as a matter of settled law, his lawsuit should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A. The Article's Backdrop: An Ongoing Focus on Pentagon Leaks

In 2025, a number of news outlets reported that the Pentagon had launched an investigation into what it said were leaks of national security information. That coverage also reported on the personnel fallout from these suspicions and investigations.[1]

On March 21, 2025, Defense Secretary Pete Hegseth's then-Chief of Staff, Joe Kasper, issued a memorandum regarding "Efforts to Combat Unauthorized Disclosures," requesting that the Director for Defense Intelligence provide assistance in investigating "[r]ecent unauthorized disclosures of national security information involving sensitive communications with principals within the Office of the Secretary of Defense (OSD)."[2] The memorandum did not identify what

[1] The Court may properly take judicial notice of the background fact that these news reports, detailed below, and the information they contain, were published. *See, e.g.*, Fed. R. Evid. 201(c); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (court may take judicial notice of newspaper articles for the fact that they published certain information, without accepting the truth of their assertions); *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts).

[2] *See* Mem. from Joe Kasper, Chief of Staff, U.S. Dep't of Def., to Under Sec'y of Def. for Intel. & Sec., *Efforts to Combat Unauthorized Disclosures* (Mar. 21, 2025), https://media.defense.gov/2025/Mar/21/2003674265/-1/-1/0/EFFORTS-TO-COMBAT-UNAUTHORIZED-DISCLOSURES-OSD002809-25-RES-FINAL.PDF. The Court may take judicial notice of this official memorandum as well as other government records, referenced below and available on government websites. *See, e.g.*, *United States ex rel. Gardner v. Vanda Pharms., Inc.*, 2020 WL 2542121, at *12 n.8 (D.D.C. May 19, 2020).

disclosures were under investigation, although Secretary Hegseth later reportedly said this inquiry related to "a series of serious leaks at the Pentagon" disclosing information to journalists about its plans (a) to "reclaim" the Panama canal militarily and (b) to brief Elon Musk on a potential war with China.[3]

Shortly thereafter, the acting Inspector General for the Department of Defense announced it was launching its own investigation into Secretary Hegseth's and other Department personnel's use of the Signal messaging app "to discuss information pertaining to military actions in Yemen in March 2025."[4] This followed *The Atlantic*'s publication of an article detailing a Signal chat thread that included its editor-in-chief, in which Secretary Hegseth and other officials discussed military strikes in real time.[5] In a report issued in December 2025, the Inspector General concluded that using Signal to communicate sensitive information about a

---

[3] Rachael Bade *et al.*, *Hegseth Says Staffers Found Leaking "Will Be Prosecuted" Amid Pentagon Chaos*, POLITICO (Apr. 22, 2025), https://www.politico.com/news/2025/04/22/pete-hegseth-leaks-investigation-00302506; *see also* Eric Schmitt et al., *Pentagon Set Up Briefing for Musk on Potential War With China*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/politics/musk-pentagon-briefing-china-war-plan.html; Courtney Kube, Gordon Lubold & Carol E. Lee, *Trump White House has asked U.S. military to develop options for the Panama Canal, officials say*, NBC News (Mar. 13, 2025), https://www.nbcnews.com/politics/national-security/trump-white-house-asked-us-military-develop-options-panama-canal-offic-rcna195994.

[4] *See* U.S. Dep't of Def. Off. of Inspector Gen., *Evaluation of the Secretary of Defense's Reported Use of a Commercially Available Message Application for Official Business* (Project No. D2025-DEVOPC-0095.000) (Apr. 3, 2025), https://media.defense.gov/2025/Apr/03/2003681607/-1/-1/1/EVALUATION%20OF%20THE%20SECRETARY%20OF%20DEFENSE%27S%20REPORTED%20USE%20OF%20A%20COMMERCIALLY%20AVAILABLE%20MESSAGE%20APPLICATION%20FOR%20OFFICER%20BUSINESS%20%28PROJECT%20NO.%20D2025-DEV0PC-0095.000%29.PDF.

[5] Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://www.theatlantic.com/politics/archive/2025/03/trump-administration-accidentally-texted-me-its-war-plans/682151/.

military operation, particularly one underway, "created a risk to operational security that could have resulted in failed U.S. mission objectives and potential harm to U.S. pilots."[6]

In April 2025, various news outlets reported that three top aides to Secretary Hegseth—Dan Caldwell, Darin Selnick, and Colin Carroll—were put on leave and then fired following a leak investigation.[7] In a joint statement published on April 19, the three former officials stated they were "incredibly disappointed by the manner in which our service at the Department of Defense ended."[8] "At this time," their statement continued, "we still have not been told what exactly we were investigated for, if there is still an active investigation, or if there was even a real investigation of 'leaks' to begin with."[9]

---

[6] U.S. Dep't of Def. Off. of Inspector Gen., *Evaluation of the Secretary of Defense's Reported Use of a Commercially Available Messaging Application for Official Business*, Rep. No. DODIG-2026-021 at 25 (Dec. 2, 2025), https://media.defense.gov/2025/Dec/04/2003834916/-1/-1/1/DODIG_2026_021.PDF.

[7] *E.g.*, Greg Jaffe & John Ismay, *Top Pentagon Advisers Put on Leave in Leak Investigation*, N.Y. Times (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/politics/pentagon-leak-investigation.html; Lolita C. Baldor, *Three Hegseth aides ousted in leak investigation decry 'baseless attacks'*, Associated Press (Apr. 19, 2025), https://apnews.com/article/hegseth-leak-probe-officials-ousted-a21e9ee6db5b75707ddc66e360eee874; Daniel Lippman, *'Unconscionable': 3 former Pentagon officials say they don't know why they were fired*, Politico (Apr. 19, 2025), https://www.politico.com/news/2025/04/19/pentagon-firings-turmoil-hegseth-00299815.

[8] Dan Caldwell (@dandcaldwell), *Joint statement from Dan Caldwell, Colin Carroll, and Darin Selnick* (statement regarding their dismissal from the Department of Defense), X.com (Apr. 19, 2025, 4:26 PM), https://x.com/dandcaldwell/status/1913701312929149363.

[9] *Id.*

One week later, the Department announced that Fulcher would be one of three senior advisors to the Secretary.[10] Fulcher was hired despite reporting by *Forbes* raising questions about whether he had embellished his resume,[11] a claim that Fulcher challenged a year later in a South Carolina lawsuit that remains pending.[12] Simultaneously, news outlets reported that Kasper said he was stepping down as chief of staff and would rejoin the private sector with a limited special government employee role.[13]

On May 27, 2025, *The Guardian* published an article—not challenged here—by award-winning journalist Hugo Lowell titled "White House stunned as Hegseth inquiry brings up illegal wiretap claims." That May 27 article reported that "[t]he White House has lost confidence in a

[10] DOD Senior Advisor Announcements (Apr. 24, 2025), https://www.war.gov/News/Releases/Release/Article/4166222/dod-senior-advisor-announcements/.

[11] David Jeans, *A Top Pentagon DOGE Official Looks Like A Successful Founder. His Story Doesn't Always Add Up*, Forbes (Mar. 4, 2025, 6:00 AM), https://www.forbes.com/sites/davidjeans/2025/03/04/pentagon-doge-official-justin-fulcher.

[12] *Fulcher v. Forbes Media LLC*, 26-cv-1426 (D.S.C.) (originally filed March 3, 2026 in S.C. Court of Common Pleas). Remarkably, in that lawsuit, Fulcher claims that the *Forbes* article deprived him of certain business opportunities, and yet in the instant lawsuit he claims *The Guardian*'s Article published three months later caused him to be deprived of the exact same opportunities. *Compare id.* Dkt. 1-1 ¶ 16 ("Fulcher was in the latter stages of negotiating an advisory/consulting agreement with a venture capital-backed firm, which could have yielded Fulcher up to $12 million in total cash and equity compensation. These negotiations were terminated once Fulcher's counter-parties learned of the Article.") *with* Compl. ¶ 14 (including the identical allegation verbatim, but attributing those same alleged damages to the challenged *Guardian* Article).

[13] Daniel Lippman & Jack Detsch, *Controversial Hegseth chief of staff to leave Pentagon*, Politico (Apr. 24, 2025), https://www.politico.com/news/2025/04/24/hegseth-chief-of-staff-pentagon-leaving-00308721; Dan Lamothe, *Hegseth's chief of staff exits amid Pentagon turmoil*, Wash. Post (Apr. 24, 2025), https://www.washingtonpost.com/national-security/2025/04/24/hegseth-joe-kasper/; Joseph Gedeon, *Pete Hegseth's controversial chief of staff leaves post unexpectedly*, The Guardian (Apr. 25, 2025), https://www.theguardian.com/us-news/2025/apr/25/pete-hegseth-joe-kaspar-exit.

Pentagon leak investigation that Pete Hegseth used to justify firing three top aides last month, after advisers were told that the aides had supposedly been outed by an illegal warrantless National Security Agency (NSA) wiretap."[14] The article explained that this "extraordinary explanation alarmed the advisers," as "such a wiretap would almost certainly be unconstitutional and an even bigger scandal than a number of leaks." *Id.* It also reported that "the advisers found the claim to be untrue and complained that they were being fed dubious information by Hegseth's personal lawyer, Tim Parlatore, who had been tasked with overseeing the investigation." *Id.* The article further stated that those advisors "have privately suggested they no longer have any idea about who or what to believe" regarding the leak investigation and firings, adding that one source "suspected the investigation had been used to get rid of aides involved in the infighting with" Kasper. *Id.*

**B. The Challenged Article**

On June 9, 2025, *The Guardian* published the Article at issue here. The Article was also authored by Lowell and titled "Hegseth aide upended Pentagon leak inquiry with false wiretap claims." Compl. ¶ 5.[15] The Article begins:

> Days before Pete Hegseth fired three top aides last month over a Pentagon leak investigation into the disclosure of classified materials, according to four people familiar with the episode, a recently hired senior adviser said he could help with the inquiry.

---

[14] Hugo Lowell, *White House Stunned as Hegseth Inquiry Brings Up Illegal Wiretap Claims*, The Guardian (May 27, 2025), https://www.theguardian.com/us-news/2025/may/27/hegseth-pentagon-leak-investigation-wiretap.

[15] The Article is attached hereto as Exhibit 1 and available at https://www.theguardian.com/us-news/2025/jun/09/hegseth-wiretap-inquiry-justin-fulcher. The Court may properly consider the Article, which is cited and quoted throughout the Complaint, in adjudicating this motion. *Camp v. Pro. Emp. Servs*., 2025 WL 2694832, at *2 (D.D.C. Sept. 22, 2025). In quoting from the Article herein, *The Guardian* includes hyperlinks as they appeared in the published online version.

> The adviser, Justin Fulcher, suggested to Hegseth's then chief of staff, Joe Kasper, and Hegseth's personal lawyer, Tim Parlatore, that he knew of warrantless surveillance conducted by the National Security Agency (NSA) that had identified the leakers.
>
> Fulcher offered to share the supposed evidence as long as he could help run the investigation, three of the people said. But when he eventually sat down with officials, it became clear he had no evidence of a wiretap, and the Pentagon had been duped.
>
> The problem was that development was not communicated to the White House—so several Trump advisers who were told of the NSA wiretap claim believed that was part of the "smoking gun" evidence against the three aides fired by Hegseth, until they developed their own doubts.

Article at 1.

The Article also provided background on Fulcher's involvement at the Pentagon, including that "Fulcher started at the Pentagon on the first day of the Trump administration as the lead staffer for Doge ('department of government efficiency'), armed with a top secret/sensitive compartmented information clearance and a mandate from Elon Musk to oversee mass cuts at the defense department, the people said." It also reported that, "when Fulcher first introduced himself to Hegseth's senior staff, he talked about having once worked for the NSA and how he had run various startups, the people said." *Id.* at 2. The Article noted, however, that "no one checked whether he had connections to the NSA," nor had officials "follow[ed] up on a Forbes article published in March that concluded he had embellished parts of his résumé." *Id.*[16]

According to the Article, "[a]t the start of April, Musk replaced Fulcher as the Doge lead at the Pentagon. But Hegseth liked Fulcher, who had recently traveled with the secretary on an official trip to Panama, and Fulcher was brought on as a senior adviser." *Id.* at 2. The Article

[16] The hyperlinked *Forbes* article is the subject of Fulcher's pending lawsuit against that publication. *See* n.12 *supra*.

noted that Secretary Hegseth had initiated a leak investigation around that time. The Article continued:

> It was not immediately clear why Fulcher chose to become involved in the investigation, but several days after he was replaced as the Doge lead, he went to Kasper and expressed a willingness to help with the investigation, which Kasper attributed to him wanting to prove his worth, two of the people said.
>
> Kasper told Fulcher to go to Parlatore, who had been tasked with supervising and managing the investigation. When Fulcher approached Parlatore, he suggested that he knew of NSA intercepts supposedly showing that Caldwell had leaked using his personal phone, the two people said.
>
> Looking back on the chain of events, three people familiar with the conversations described Fulcher's claims as conveniently dovetailing with prevailing suspicions at the time about Caldwell printing lots of documents and his efforts to have the leak investigation shut down.
>
> Still, a cursory check at that stage into the NSA claims would have shown them to be false. Pentagon investigators concluded in the weeks after the firings that there was no **authorized or unauthorized** wiretap through the NSA, which is a component of the defense department.
>
> The claims were relayed to Hegseth and the White House as being accurate. The White House press secretary, Karoline Leavitt, said at a briefing the three aides had been fired as they "leaked against their boss", while Hegseth predicted on Fox News they would be prosecuted although there has been no referral to date to the justice department.

*Id.* at 3 (emphasis added).

In addition to describing these events based on Lowell's multiple unnamed sources, the Article also included Fulcher's denial:

> Fulcher has said this account is not correct. In a statement, he said he never suggested there were NSA wiretaps or that he had access to wiretap records. "I never approached Parlatore, Kasper or anyone else offering 'surveillance evidence' and did not ask to join an investigation on that or any other basis," he said.

*Id.* at 2.

Although the Article raised questions about Fulcher's role in these events, it also reflected poorly on Pentagon leadership and the White House's confidence in that leadership. Specifically, the Article stated that "[t]he extraordinary episode adds to the growing portrait of dysfunction inside Hegseth's front office, which is involved in setting the direction of a department that has a budget of nearly $1tn and oversees more than 2 million troops around the world." *Id.* In that regard, *The Guardian* also reached out to the Pentagon and White House for comment, but a Pentagon spokesperson declined and a White House spokesperson did not respond. *Id*. Neither disputed the reporting. *Id.*[17]

**C. This Lawsuit**

A year after publication of the Article, and without ever seeking a correction, Fulcher filed the instant lawsuit. In his Complaint, he alleges that "[t]he Article contains numerous false and defamatory statements of and concerning Mr. Fulcher that are attributed to four unnamed sources." Compl. ¶ 6. Although he enumerates twelve challenged statements from the Article, he essentially claims that *The Guardian* defamed him by reporting that he attempted to insert himself in the leak investigation and falsely claimed that he had evidence of NSA surveillance that would assist in the inquiry. *Id.* ¶ 8 (alleging "Mr. Fulcher never suggested, stated or otherwise communicated . . . that the NSA had conducted warrantless surveillance that identified the source(s) of the leak alleged in the Article, or that Mr. Fulcher had access to such

[17] In March 2026, various news outlets reported Caldwell "had been cleared of any wrongdoing" in connection with the leak investigation and had been hired by the Office of the Director of National Intelligence. *See* Phil Stewart, *Ousted Former Pentagon Official Hired for Intelligence Role*, Reuters (Mar. 16, 2026), https://www.reuters.com/world/us/ousted-former-pentagon-official-hired-intelligence-role-nyt-reports-2026-03-16/; Greg Jaffe & Julian E. Barnes, *Aide Accused by Hegseth of Leaking Is Hired for Intelligence Job*, N.Y. Times (Mar. 16, 2026), https://www.nytimes.com/2026/03/16/us/politics/dan-caldwell-pentagon-dni.html; *see also* @dandcaldwell, https://x.com/dandcaldwell ("Currently serving at ODNI.").

surveillance," and he "never asked Joe Kasper, Tim Parlatore, or anyone else if he could join or assist with an investigation into the leak alleged by the Article, nor did he tell anyone that he could 'help run' it").

Fulcher devotes all of one paragraph of his Complaint to trying to plead actual malice, advancing two theories. *Id.* ¶ 13. First, he contends that *The Guardian* published the Article with actual malice because it believed its multiple unnamed sources instead of crediting his denials. *Id.* In that regard, he alleges the sources "had an obvious bias against Mr. Fulcher because, among other things, and on information and belief, Mr. Fulcher replaced, at least in part, the role(s) occupied by one or more of the sources, rendering these sources and their statements inherently unreliable." *Id*. Thus, he argues, it was unreasonable for *The Guardian* to credit sources who,

> on information and belief, had been terminated from their government positions, over the express denials of Mr. Fulcher, who at all relevant times, remained in good standing with the United States Government, and who spoke to Hugo Lowell, the author of the Article who resides in Washington, D.C., over the telephone prior to publication and provided a detailed explanation (in addition to the statement published in the Article) as to why the statements at issue were false.

*Id.* Fulcher also claims that, if what *The Guardian* reported about Fulcher were true, "it is reasonably expected that Mr. Fulcher would have been disqualified from a position with the government, instead of being brought on as senior advisor for the Secretary of War, Pete Hegseth, as acknowledged in the Article." *Id.*

Second, Fulcher alleges that *The Guardian* should not have believed its multiple sources because their description of events was inherently implausible. Specifically, even though actual malice focuses on the defendant's *subjective* awareness of probable falsity and not whether it *objectively* failed to investigate and consider additional information, Fulcher claims that *The*

*Guardian* "disregard[ed] readily available information" about the legality of domestic NSA intercepts. *Id.* In that regard, he alleges the NSA is legally authorized to conduct warrantless intercepts only "for the purpose of acquiring 'foreign intelligence' that consists of communications exclusively between foreign powers," and the individuals involved in the suspected leaks were U.S. citizens purportedly communicating with U.S.-based media outlets. *Id.* Fulcher categorically asserts that, because such unauthorized intercepts are prohibited by law, "the NSA could not have conducted the warrantless searches described in the Article." *Id.*

Fulcher also alleges that Kasper and Parlatore were aware that such warrantless surveillance would be prohibited by law, "and thus the Article's allegations that Mr. Fulcher had informed Kasper . . . and Parlatore of the existence of purported warrantless wiretaps of United States citizens, and that Kasper, Parlatore and advisors for President Trump believed Mr. Fulcher's alleged statements or had been 'duped'" are sufficiently "implausible" to constitute actual malice. *Id.* The Complaint makes no mention of the fact that, as described above, *The Guardian*'s reporting expressly noted that such intercepts would be unlawful and that Pentagon officials ultimately concluded there had been "no authorized *or unauthorized* wiretap through the NSA." Article at 3 (emphasis added).

In his Complaint, Fulcher seeks presumed, actual, and compensatory damages; punitive damages; and a permanent injunction against publication of the challenged statements. Compl. ¶¶ 16-17, Prayer for Relief.

Because Fulcher's allegations, even if proven, would not constitute clear and convincing proof of actual malice, his Complaint should be dismissed with prejudice.

## STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In conducting this review, the Court should not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin*, 818 F.3d at 756 (citation omitted). Nor should the Court "accept legal conclusions couched as factual allegations." *Id*. (citation omitted).

## ARGUMENT

In the District of Columbia, a defamation plaintiff must plausibly allege facts establishing that the defendant "made false and defamatory statements, published those statements to a third party, acted with (at least) negligence, and thereby caused a special harm to" the plaintiff. *Couch v. Verizon Commc'ns Inc*., 105 F.4th 425, 431 (D.C. Cir. 2024). Moreover, under the First Amendment, plaintiffs who are public officials or public figures must plead (and ultimately prove by clear and convincing evidence) that the publisher acted with "actual malice," a term of art requiring proof that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also, e.g.*, *Thompson v. Armstrong*, 134 A.3d 305, 311 (D.C. 2016) (same).

Under *Iqbal* and *Twombly*, this means a public official libel plaintiff like Fulcher must allege facts that could, if proven, plausibly establish publication with actual malice. *See, e.g.*,

*Couch*, 105 F.4th at 436 (affirming dismissal of statements that "lack any evidence that could prove actual malice"); *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 241-43 (D.C. Cir. 2021) (same); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 144 (D.D.C. 2017) (dismissing claim where pleaded facts failed to establish "that [defendant] acted with actual malice or reckless disregard for the facts when it published the article in question"); *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 86 (D.D.C. 2019) (same); *Hourani v. PsyberSolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016) (same); *Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 263 (D.D.C. 2013) (same); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012) (same).[18]

Given that the actual malice standard purposely affords "breathing space" for speech about public officials, *Sullivan*, 376 U.S. at 272, the D.C. Circuit has understandably described a plaintiff's burden as "famously daunting." *Couch*, 105 F.4th at 432 (cleaned up). In that regard, the Court of Appeals has emphasized the importance of scrutinizing defamation claims early in the case to prevent litigation from being used to chill such speech:

> The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters . . . the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits.

---

[18] In addition to the D.C. Circuit, "every circuit that has considered the matter" has held that dismissal is warranted where a plaintiff fails to plead facts "sufficient to give rise to a reasonable inference of" actual malice. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012); *Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 745 (5th Cir. 2019); *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 868 (6th Cir. 2020) (defamation plaintiff failed to make plausible allegation of actual malice necessary to overcome state-law qualified privilege); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Nelson Auto Ctr. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018).

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017); *see also Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 111 (D.D.C. 2011) (because the burdens of litigation can chill valuable speech "even if a defendant ultimately prevails," courts regularly recognize that defamation cases should be resolved "through summary procedures when and as soon as possible") (citing *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996), and *McBride v. Merrell Dow & Pharms., Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983)).

## I. FULCHER WAS A PUBLIC OFFICIAL AT THE TIME OF PUBLICATION.

It is well-established that, for purposes of defamation suits, the First Amendment distinguishes public officials and public figures from private figures, with the latter entitled to greater protection from reputational harm because they lack the same ability to respond to speech critical of them. Indeed, in light of this country's "profound national commitment" to debate on public issues, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016) (quoting *Sullivan*, 376 U.S. at 270), those who choose to engage in public endeavors accept a greater risk of critical public comment and scrutiny, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003).

As a senior Pentagon advisor at the time of the Article, Fulcher is indisputably a public official for these purposes. His "'position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.'" *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). The actual malice standard applies broadly to both an employee's "official conduct" as well as "anything which might touch on an official's fitness for office." *White v. Fraternal Order of Police*, 909 F.2d 512, 517 (D.C. Cir. 1990) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974)); *see also Gertz*, 418

U.S. at 345 (explaining that "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation").

Fulcher's Complaint acknowledges that, at the time the Article was published, he was a Senior Advisor to Secretary Hegseth—a position with wide-ranging impact on government policy and affairs. *See* Compl. ¶ 13; *see also, e.g.*, *Harvey v. CNN, Inc.*, 48 F.4th 257, 273 (4th Cir. 2022) (former member of the National Security Council and a U.S. representative's senior advisor is a public official); *Murray v. Shaw*, 2025 WL 915752, at *25 (D.D.C. Mar. 26, 2025) (public employee responsible for advising executive management at the Social Security Administration's Office of the Inspector General is a public official), *appeal filed*, No. 25-5196 (D.C. Cir. May 28, 2025). Fulcher's Complaint further alleges that the Article accused him of making false claims that he had evidence of NSA intercepts, allegations that he concedes relate to his fitness for his office. *See* Compl. ¶ 13 (averring "it is reasonably expected that" the conduct ascribed to Fulcher "would have . . . disqualified [him] from a position with the government" but he was instead elevated to Senior Advisor to Secretary Hegseth). As such, Fulcher must meet the actual malice pleading standard.[19]

[19] Because the Article relates to Fulcher's official conduct while a Pentagon adviser, he is still considered a public official who must satisfy the actual malice standard even though he has since left government service. Indeed, that would be the case had the Article been published after his departure, rather than, as here, while he was still employed by the Pentagon. *See, e.g.*, *Gray v. Udevitz*, 656 F.2d 588, 590 n.3 (10th Cir. 1981) (That the plaintiff "no longer holds the same position does not by itself strip him of his status as a public official for constitutional purposes. If the defamatory remarks relate to his conduct while he was a public official and the manner in which he performed his responsibilities is still a matter of public interest, he remains a public official within the meaning of *New York Times*."); *Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 510 n.67 (3d Cir. 1978) (plaintiff, who left office three years prior to the airing of the challenged television program, was public official because program "was in large part about decisions made at the time that Pierce was in office"); *see also Rosenblatt*, 383 U.S. at 87 n.14 ("It is not seriously contended, and could not be, that the fact respondent no longer supervised the Area when the column appeared has decisional significance here.").

## II. FULCHER DOES NOT PLEAD FACTS THAT, IF PROVEN, WOULD ESTABLISH ACTUAL MALICE.

In determining whether a plaintiff has pled sufficient facts to plausibly state his claim, courts may properly "peer down the road towards a plaintiff's eventual evidentiary burden to deduce whether he plausibly alleged the types of facts that can, if proven, satisfy that burden." *Couch*, 105 F.4th at 432; *cf. Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986) (ruling that, at summary judgment stage, court similarly must consider "clear and convincing" evidentiary burden for establishing actual malice). To meet this burden, Fulcher "must allege facts that, if proven, would show that the defendants either knew their statements were false, had high awareness that the statements were probably false, or had serious doubts about the accuracy of the statements." *Couch*, 105 F.4th at 432; *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (plaintiff must show that "defendant in fact entertained serious doubts as to the truth of his publication.").

Under this analysis, neither of Fulcher's alleged bases for alleging actual malice comes anywhere close to moving his claim "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680. His failure to meet his pleading burden as to the actual malice element mandates dismissal.

### A. Relying on Multiple Sources, While Failing to Credit Plaintiff's Denials, Does Not Constitute Actual Malice.

At bottom, Fulcher alleges that *The Guardian* should have credited his denials over its four sources' statements, including because he was elevated to senior advisor at the Pentagon after the aides were fired, and therefore he was ostensibly more credible. Compl. ¶ 13. Fulcher surmises that, even though those sources were unnamed, they "had an obvious bias against Mr. Fulcher" because he "replaced, at least in part, the role(s) occupied by one or more of the

sources." *Id*. Fulcher's theory of the case—that the press is required to believe an official treated with favor by the administration over those who are on the outs with it—is particularly problematic. It is antithetical to our democratic form of government, which protects both citizens' ability to criticize the government and its officials, as well as the press's ability to report those criticisms, rather than blindly touting the views of whoever is in power at that particular moment. And even if there were some sort of "must-believe-officials" requirement, here neither the Pentagon nor the White House denied what *The Guardian*'s sources said, leaving Fulcher on even shakier ground in arguing that the publisher was required to believe his denials.

Fulcher's effort to establish actual malice on this basis fails for numerous additional, interrelated reasons. ***First***, he is attempting to impose an objective fault standard on *The Guardian*, asserting it "*unreasonably* believed the accounts provided by the four unnamed sources," *id.* (emphasis added), but that is not the test. The question is whether *The Guardian* "subjectively believed" its account was false at the time of publication, not whether its belief in the truth of its account was reasonable. *Couch*, 105 F.4th at 432.

***Second***, even if Fulcher's conjectures about *The Guardian*'s sources were accurate, a source's questionable motivations do not translate to actual malice on the part of a journalist. As numerous courts have explained, "the mere possibility" that sources "may be biased in some way or hold a subjective view point does not, without more, create obvious reasons to doubt a source's accuracy or establish actual malice." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 263 (D.D.C. 2016), *aff'd on other grounds*, 875 F.3d 709 (D.C. Cir. 2017); *see also Harvey*, 48 F.4th at 274 (rejecting argument that reliance on an "unreliable source" would tend to prove actual malice, and noting "courts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice" (cleaned up)) (quoting *Talley v. Time, Inc.*, 923 F.3d 878,

903 (4th Cir. 2019)); *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (defendant's alleged reliance on sources who "were self-interested in providing [defendant] with a profitable story" was not actual malice); *Gray v. St. Martin's Press*, 221 F.3d 243, 252 (1st Cir. 2000) (reliance on a former company executive who "had an axe to grind" was not actual malice). Courts routinely reject such "bias-leads-to-actual-malice" claims because "self-interest and politics 'motivate[] many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled.'" *Fairfax v. CBS Corp.*, 2 F.4th 286, 294 (4th Cir. 2021) (quoting *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991)).

***Third***, *The Guardian* relied on *four* sources to substantiate what the Article reported, as well as to corroborate one another. Verifying and corroborating what sources say undermines any claim that a news organization published their statements believing them to be false and therefore negates a finding of actual malice. *See, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 792-793 (D.C. Cir. 1987) ("evidence of personal animus" between the primary source and the plaintiff "was not indicative of the defendants' actual malice in view of their independent corroboration"); *Satanic Temple, Inc. v. Newsweek Digital LLC*, 177 F.4th 202, 215 (2d Cir. 2026) (in report on Satanic Temple, "relying on a 'hostile' source" who left the organization could not establish actual malice where publisher "considerably corroborated" the source's statements) (cleaned up); *Talley*, 923 F.3d at 902 (defendants "did not show reckless disregard for the truth" when they "reported information that multiple sources confirmed and corroborated").

***Fourth***, as a matter of law, *The Guardian* was not required to credit Fulcher's outright denials of what its four sources said. Compl. ¶ 13. Courts have long recognized that "publishers

need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Lohrenz*, 350 F.3d at 1285 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989)); *see also Tah v. Global Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 14 (D.D.C. 2019) (same), *aff'd*, 991 F.3d 231, 242 (D.C. Cir. 2021). Indeed, because denials are so commonplace, a defendant is not even required to *seek* comment from the subject of a news report. *See, e.g.*, *Arpaio v. Cottle*, 2019 WL 11322515, at *2 (D.D.C. Dec. 3, 2019) (That the journalist "did not contact Plaintiff, 'who might reasonably be expected to deny' the statements made about him, 'is neither surprising nor required.'") (quoting *Jankovic*, 822 F.3d at 595).

***Fifth***, although not legally required, *The Guardian* did in fact seek comment from Fulcher *and* included what he said in the Article. Publishing reasons why readers might doubt the sources and reach a different conclusion reinforces a publication's subjective belief in the truth of its report and therefore negates a finding of actual malice. *See, e.g.*, *Lohrenz*, 350 F.3d at 1286 ("reporting perspectives at odds with the publisher's own, tend[s] to rebut a claim of malice, not to establish one") (cleaned up); *Michel*, 816 F.3d at 703 (including "information contrary to the general conclusions reached in an article . . . tends to undermine the claims of malice"); *Newton v. NBC, Inc.*, 930 F.2d 662, 686 (9th Cir. 1990) (repeated attempts to interview plaintiff also dispel accusation of actual malice).

***Sixth***, as the Article reflects, *The Guardian* also attempted to obtain on-the-record comments from the Pentagon and the White House. Although neither provided a statement, they notably did not deny the four sources' claims. *The Guardian*'s attempts to seek comment from them, and its inclusion of their failure to provide comment, further undermines any claim that it

published the Article with actual malice. *See, e.g.*, *Trump v. Dow Jones & Co., Inc.*, --- F. Supp. 3d ----, 2026 WL 1453673, at *7 (S.D. Fla. May 22, 2026) (*Wall Street Journal*'s attempts to contact the plaintiff (the President), various Justice Department officials and the FBI for comment demonstrate that defendants "attempted to investigate," and therefore published with "[q]uite the opposite" of actual malice).

***Finally***, in crediting its four sources over Fulcher's assertions, *The Guardian* also relied on, and cited to, the prior reporting by *Forbes*, which called into question whether Fulcher had padded his resume. *See* Article at 2 (citing the *Forbes* article). Such "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Adelson v. Harris*, 973 F. Supp. 2d 467, 502 (S.D.N.Y. 2013) (same), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

At bottom, *The Guardian* relied on four sources, sought and included comment from Fulcher, sought comment from the Pentagon and the White House, and relied on prior reporting by *Forbes*. Especially when taken in combination, *The Guardian*'s ultimate editorial decision not to credit Fulcher's denials and to publish the Article simply cannot meet the "famously daunting" actual malice standard as a matter of law. *Couch*, 105 F.4th at 432.

**B. The Supposed "Inherent Implausibility" of Unauthorized Domestic NSA Wiretapping Allegations Are Insufficient to Plead Actual Malice.**

In attempting to meet his actual malice pleading burden, Fulcher alleges it was "inherently implausible" that the NSA would engage in unauthorized surveillance, or that Kasper and Parlatore would believe Fulcher if he claimed it had done so given that they "had full knowledge of the prohibition on targeting United States citizens and those located within the country." Compl. ¶ 13. On that basis, Fulcher contends that *The Guardian* "acted with at least

reckless disregard for the truth, by consciously disregarding readily available information that showed that the false statements were at least highly likely to be false." *Id.*

While a plaintiff may in theory demonstrate actual malice by showing that a statement is "so inherently improbable that only a reckless person would have put [it] in circulation," *Jankovic*, 822 F.3d at 589-90 (cleaned up), satisfying that standard is even more daunting than other methods of establishing actual malice. It is not sufficient to contend that a statement is objectively improbable; rather, to avoid dismissal, Fulcher must plead facts that, if proven, would show *The Guardian* was "subjectively aware that [what it reported] was inherently improbable." *Id*. at 595. Accordingly, courts have routinely rejected generalized "inherent improbability" arguments. *See id.* (rejecting plaintiff's argument that "anyone familiar with Serbia would recognize the inherent improbability of an outspoken supporter of" the then-prime minister would have formerly supported a political foe, given that "[s]hifting alliances" are "common"); *see also Nunes v. NBCUniversal Media, LLC*, 2025 WL 2199115, at *10 (S.D.N.Y. Aug. 1, 2025) (given plaintiff's statements that he "distrusts" the FBI and thinks its officials are "corrupt" and "dirty," statement that he "refused" to turn a package from a Ukrainian legislator with Russian ties over to the FBI "is not so inherently improbable that only a 'reckless' person would publish it"), *appeal filed*, No. 25-2125 (2d Cir. Aug. 1, 2025); *Prince v. Intercept*, 2023 WL 4492413, at *10 (S.D.N.Y. Jul. 12, 2023) (defendant's statements that former Navy Seal met with top Russian military official not inherently improbable in light of plaintiff's background).

Here, Fulcher's arguments that the challenged statements were "so inherently improbable" as to constitute actual malice suffer from the same defects. For starters, Fulcher has not correctly framed the issue. The question is not whether domestic NSA surveillance is unlawful, but whether *The Guardian* credited its four sources when they said Fulcher *claimed* he

had evidence of such NSA intercepts and that top Pentagon officials initially believed him before concluding otherwise. In fact, *The Guardian* fully acknowledged in its earlier reporting (hyperlinked in the challenged Article) that domestic NSA surveillance would be illegal and that senior officials would therefore be deeply concerned about Fulcher's claims. *See supra* n.14 (reporting White House advisors were "alarmed" by reports that the aides had been outed by warrantless wiretaps "because such a wiretap would almost certainly be unconstitutional and an even bigger scandal than a number of leaks"); *see also* Article at 3 (referring to "authorized and unauthorized" NSA surveillance). By definition, *The Guardian* could not have subjective awareness of probable falsity imputed to it based on the illegality of domestic NSA wiretaps when it reported that very thing, including that such claims would alarm officials.

Simply put, in straining to plead actual malice, Fulcher is improperly attempting to "build inference upon inference." *Trump v. CNN, Inc.*, 684 F. Supp. 3d 1269, 1275 (S.D. Fla. 2023) (quoting *Church of Scientology v. Cazares*, 638 F.2d 1272, 1288 (5th Cir. 1981)). Specifically, he starts with the fact that domestic NSA surveillance is unlawful (as *The Guardian* reported), and then infers that it was "inherently implausible" to credit its sources' claims that (a) Fulcher claimed to have worked at the NSA and to have knowledge of such intercepts, and (b) senior officials initially believed him.[20] But even if Fulcher could permissibly stack up these cascading

[20] To the extent Fulcher complains the Article suggested that Kasper and Parlatore "fell for" Fulcher's NSA surveillance claim, any statements about their states of mind are neither "of and concerning" *Fulcher* nor defamatory as to *him*. *See, e.g.*, *Luhn v. Scott*, 2019 WL 5810309, at *4 (D.D.C. Nov. 7, 2019) (defendant's statements that she did not know about alleged sexual abuse by Fox CEO Roger Ailes "pertained exclusively to [defendant] and her own mental state" and were not of and concerning plaintiff, an alleged victim), *aff'd*, 843 F. App'x 326 (D.C. Cir. 2021); *see also Sullivan*, 376 U.S. at 288-91 (because of the "disquieting implications for criticism of governmental conduct," a public official plaintiff's claim is "constitutionally defective" where statements are not "of and concerning" him).

inferences, his claim would still fail because its premise—that such surveillance is unlawful and the NSA therefore never does it—is not nearly as ironclad as he asserts.

Indeed, while Fulcher correctly notes that the NSA is generally prohibited by law from intentionally intercepting the communications of United States citizens or of any person located within the United States without a warrant, Compl. ¶ 13, that does not mean such warrantless interception is impossible or never occurs. For example, Section 702 of the Foreign Intelligence Surveillance Act ("FISA") specifically recognizes that NSA interception will inevitably result in some overcollection of U.S. persons' communications or data, and it provides "minimization procedures" if overcollection occurs. 50 U.S.C. § 1801(h). Because such compliance violations inevitably occur, there are also statutory mechanisms for seeking redress for unlawful domestic surveillance. *See* 18 U.S.C. § 2712 (authorizing damages against the government for willful violations of FISA); *see also* 50 U.S.C. § 1810 (authorizing award of compensatory and punitive damages for unlawful use or disclosure of FISA-obtained communications).

Furthermore, although much of the NSA's work is secret, there have been a number of highly-publicized reports documenting instances in which the agency has either violated the prohibition on domestic surveillance or otherwise failed to comply with the minimization procedures. Most famously—as initially reported by *The Guardian*—documents leaked by Edward Snowden in 2013 revealed the NSA had extensively collected U.S. citizens' phone data.[21] Opinions by the Foreign Intelligence Surveillance Court have unveiled additional

[21] Guardian US Interactive Team & Ewen MacAskill, *NSA files decoded: Edward Snowden's surveillance revelations explained*, The Guardian (Nov. 1, 2013), https://www.theguardian.com/world/interactive/2013/nov/01/snowden-nsa-files-surveillance-revelations-decoded.; Amanda Holpuch, *Journalists who broke NSA story in Guardian dedicate award to Snowden*, The Guardian (Apr. 11, 2014), https://www.theguardian.com/world/2014/apr/11/journalists-nsa-guardian-polk-award-snowden.

instances of U.S. intelligence agencies collecting digital information from U.S. citizens in violation of the law.[22] *See also United States v. Hasbajrami*, 2025 WL 447498, at *7-*8 (E.D.N.Y. Feb. 10, 2025) (recognizing that warrantless queries of Americans' communications collected under Section 702 violate the Fourth Amendment and acknowledging that, "[t]o hold otherwise . . . would effectively allow law enforcement to amass a repository of communications under Section 702—including those of U.S. persons—that can later be searched on demand without limitation"), *appeal filed*, No. 25-542 (2d Cir. Mar. 10, 2025).

Thus, Fulcher is mistaken when he claims that it was so inherently implausible for *The Guardian* to believe that the NSA could "have conducted the warrantless searches described in the Article" much less that Fulcher could have claimed he had access to such surveillance or that Pentagon officials would initially believe such a claim before concluding it was not credible. Compl. ¶ 13. To the contrary, it was entirely plausible that Kasper and Parlatore believed Fulcher's claims where, as the sources told *The Guardian*, Fulcher had also represented he had previously worked for the NSA, Article at 2, and higher ups at the Pentagon would presumably be aware that (as *The Guardian* put it in the Article) both "authorized or unauthorized wiretaps" occur, at least from time to time, *id*. Moreover, the Article was published against the backdrop of a larger series of issues reportedly plaguing the leadership of the Pentagon at the time. These

---

[22] *See, e.g.*, Mem. Op. and Order at 31 (FISC Apr. 21, 2022), *available at* https://www.intelligence.gov/assets/documents/702-documents/declassified/21/2021_FISC_Certification_Opinion.pdf (revealing that the FBI alone had conducted over 278,000 non-compliant queries of raw FISA-acquired information using U.S. person identifiers); Mem. Op. (FISC Oct. 3, 2011), *available at* https://www.aclu.org/documents/foreign-intelligence-surveillance-court-memorandum-opinion-october-2011 (revealing the NSA's upstream internet collection program was collecting multi-communication transactions (MCTs), which are packets of data containing multiple communications bundled together and which contained many wholly domestic communications that had nothing to do with a foreign intelligence target).

included the probe into the Signal chat discussing military strikes in real time, and the firing of multiple aides, followed by Kasper's departure—all of which, taken together, depict an agency in disarray that further made the statements attributed to *The Guardian*'s sources all the more believable.[23]

Because Fulcher's "inherent implausibility" allegations would not, even if proven, establish clear and convincing evidence of actual malice, his Complaint should be dismissed.

## III. FULCHER'S LAWSUIT SHOULD BE DISMISSED WITH PREJUDICE.

"Dismissal with prejudice is warranted when 'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). And where a plaintiff's allegations of actual malice are incapable of being cured given his core factual allegations, dismissal with prejudice is warranted based on a failure to plead facts that, if proven, would constitute actual malice. *See Couch*, 105 F.4th at 436 (affirming dismissal of original complaint and denial of motion for leave to amend).

Here, Fulcher claims that he can establish actual malice even though *The Guardian* relied on *four* sources, sought comment from him, included his denials, sought comment from the Pentagon and White House (neither of which denied the allegations), and relied on prior reporting in a reputable publication (*Forbes*). In such circumstances, no amount of amendment will cure Fulcher's patent inability to plead actual malice. His alternative contention that the

[23] In that regard, Fulcher alleges that Kasper "was terminated from his position with the Department of War before Mr. Fulcher even began working there." Compl. ¶ 13. Kasper reportedly left in late April 2025, *see* n.13 *supra*, and Fulcher's own LinkedIn profile states he was Senior Advisor to the Secretary of War from January through August 2025, directly contradicting his Complaint. *See* https://www.linkedin.com/in/mrjustinfulcher; *see also* @JustinFulcher, *An honor to serve alongside @SecDef @PeteHegseth*, X.com (July 19, 2025, 7:38 PM), https://x.com/JustinFulcher/status/1946716368532906359.

illegality of domestic NSA surveillance means that *The Guardian*'s reporting was so "inherently implausible" that it can be deemed published with actual malice likewise cannot be salvaged by amendment. The Complaint should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, *The Guardian* respectfully requests that the Court dismiss Fulcher's Complaint with prejudice and grant such other and further relief as the Court deems just and proper.

Dated: August 17, 2026

Respectfully submitted,

BALLARD SPAHR LLP

By: *__/s/ Seth D. Berlin__*
Seth D. Berlin (Bar No. 433611)
Lauren P. Russell (Bar No. 7567949)
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Tel: (202) 661-2200
Fax: (202) 661-2299
berlins@ballardspahr.com
russelll@ballardspahr.com

*Counsel for Defendant Guardian News & Media LLC*